UNITED STATES DISTRICT COURT
DISTRICT OF CONNECTICUT

_____
LISA WHIDBEE                              )      CIVIL ACTION NO.
     Plaintiff                          )
                                       )
v.                                        )      JURY TRIAL DEMANDED
                                       )
BRITISH MOTOR WORKS, LLC,                 )
BRITISH MOTOR WORKS II, LLC, AND          )
JPMORGAN CHASE BANK, NATIONAL             )
ASSOCIATION d/b/a LAND ROVER              )
FINANCIAL GROUP                           )
     Defendants                         )
_____ )       DECEMBER 14, 2017


**COMPLAINT**

**I. INTRODUCTION**

1.      This is a suit under the Magnuson/Moss Warranty Act ("MMWA"), 15

U.S.C. §§ 2301 *et seq.*, and Article 2 of the Uniform Commercial Code ("UCC"), Conn.

Gen. Stat. §§ 42a-2-101 *et seq.*, against British Motor Works, LLC and British Motor

Works II, LLC, (collectively, "British Motor Works"), two car dealerships that fraudulently

and maliciously sold Plaintiff a 2012 Land Rover (the "Vehicle") under the description of

"Certified Pre-Owned" ("CPO") vehicle, even though the Vehicle had previously

suffered significant prior accident damage and flood damage and had been negligently

repaired, and even though the Vehicle had not been registered with Land Rover as part

of its Certified Pre-Owned vehicle program.  Furthermore, Plaintiff asserts claims for

fraudulent misrepresentation and violation of the Connecticut Unfair Trade Practices

Act ("CUTPA"), Conn. Gen. Stat. § 42-110a *et seq.* for British Motor Works conduct.

Defendant JPMorgan Chase Bank, National Association d/b/a Land Rover Financial

Group ("Chase"), as holder of the contract, is liable to Plaintiff pursuant to the contract terms and by operation of Conn. Gen. Stat. § 52-572g.

## II.  PARTIES

2.      Plaintiff, Lisa Whidbee ("Whidbee"), is a natural person residing in Waterbury, Connecticut, and she is a "consumer" as that term is defined in §2301(3) of MMWA.

3.      British Motor Works are Connecticut limited liability companies that currently operate, or have previously operated, motor vehicle dealerships in Fairfield and Milford, Connecticut that also share the same Member, Ryan Ambrifi. British Motor Works are or were authorized dealerships for Land Rover and are warrantors as that term is defined in §2301(5) of MMWA.

4.      Chase is a national association with a business address in Columbus, Ohio and it accepts assignment of retail installment contracts from Connecticut automobile dealerships.

## III. JURISDICTION

5.      Jurisdiction in this court is proper pursuant to 15 U.S.C. § 2310(d)(1)(B) and 15 U.S.C. § 1332.  Specifically, the total sale price for the Vehicle, as alleged below, is $29,708.81.  When this amount is combined with Plaintiff's claim for common law punitive damages, which are based upon the attorney's fees incurred by her and which are expected to exceed $50,000, then the total amount in controversy exceeds $50,000.  Supplemental jurisdiction exists for the state law claims pursuant to 28 U.S.C. § 1367.

6.      This Court has jurisdiction over British Motor Works because they are Connecticut limited liability companies and regularly do business in Connecticut.

7.      This Court has jurisdiction over Chase because it regularly does business in Connecticut.

8.      Venue in this Court is proper, because the transaction alleged herein occurred in this state.

## IV.  FACTUAL ALLEGATIONS

9.      Jaguar Land Rover North America, LLC ("Land Rover") and its dealerships, including British Motor Works, promote Land Rover's Certified Pre-Owned program as a means of marketing pre-owned vehicles.

10.      Vehicles included in the CPO program are represented by Land Rover and the participating dealerships as having undergone a "robust" 165-point inspection and safety check to ensure every vehicle is "as good as new" and to ensure that they meet the program's stringent certification criteria.

11.      Prior to June 30, 2017, British Motor Works advertised the Vehicle for sale on the Internet as a "Certified 2012 Land Rover LR4" for a sale price of $24,991.

12.      Plaintiff visited British Motor Works in Milford and she test drove the Vehicle for a short distance.

13.      Relying on the representations of British Motor Works and its authorized agents that the Vehicle was a Land Rover Certified Pre-Owned Vehicle and would include the Land Rover Certified Pre-Owned warranty, Whidbee elected to purchase the Vehicle.

14.     Unbeknownst to Whidbee, prior to the time that she purchased the Vehicle, it had been in an accident or event that caused significant structural misalignment that had not been adequately repaired, leaving the Vehicle unsafe to drive.

15.     Additionally, the Vehicle had been exposed to water in a flood or other event, causing significant corrosion to the Vehicle's underside.

16.     On or about July 1, 2017, Whidbee returned to British Motor Works in Milford to finalize the purchase of the Vehicle.

17.     Whidbee paid $6,000 as a down payment for the Vehicle to British Motor Works.

18.     British Motor Works prepared a Retail Installment Contract (the "Contract") that was backdated June 30, 2017 and that listed a cash price of $29,708.81, including $2,023.81 sales tax.

19.     Whidbee financed the balance of $28,079.81 pursuant to a retail installment contract (the "Contract" that was assigned to Chase.

20.     British Motor Works also provided Whidbee with a "LAND ROVER APPROVED CERTIFIED PRE-OWNED DELIVERY CHECKLIST" and a Land Rover's Certified Pre-Owned booklet for the Vehicle.

21.     British Motor Works also provided Whidbee with a Buyers Guide that indicated the Vehicle was "Land Rover Factory Certified" and was covered under that warranty until August 30, 2018 or 100,000 miles.

22.     The representations regarding the Vehicle being a certified pre-owned vehicle on the Buyer's Guide were expressly incorporated into the terms of the Purchase Order and were a part of the Contract.

23.     Whidbee took delivery of the Vehicle on July 1, 2017.

24.     British Motor Works failed to provide Whidbee with a copy of the Purchase Order.

25.     Immediately after taking delivery of the Vehicle, on July 1, 2017, the Vehicle began vibrating when driven at highway speed and it was making a loud knocking sound, and multiple warning lights came on including the Vehicle's check engine light.  Whidbee called British Motor Works and spoke with Leo Caputo, the finance manager, and told him the Vehicle was inoperable and requested that British Motor Works retrieve the Vehicle.

26.     British Motor Works retrieved the Vehicle from Whidbee by tow truck.

27.     British Motor Works had the Vehicle in its possession for repairs until July 28, 2017 when it notified Whidbee that repairs were complete.  Whidbee was provided with a repair order detail that indicated British Motor Works had replaced an oxygen sensor.

28.     Less than one week after receiving the Vehicle back from British Motor Works, Whidbee heard a loud noise coming from the engine and she felt a vibration and rocking.  Whidbee pulled the Vehicle into a parking lot and called British Motor Works.  Whidbee spoke with Moya Singh ("Singh"), a service manager, who told Whidbee that she did not have anyone available to retrieve the Vehicle and instructed Whidbee to drive the Vehicle to British Motor Works.

29.     While driving the Vehicle to British Motor Works, Whidbee had difficulty holding and controlling the steering wheel, and she was shaking with fear that she would lose control of the Vehicle.

30.     Whidbee met with Singh and a mechanic when she arrived at British Motor Works, and the mechanic insisted that he take a test drive with Whidbee.  While Whidbee was driving with the mechanic, Whidbee could feel the Vehicle swaying and she heard a loud clunking sound when the Vehicle's steering wheel was turned towards the right.  Whidbee stopped the Vehicle and refused to drive it any longer, and the mechanic drove the Vehicle back to British Motor Works.

31.     When Whidbee and the mechanic returned to British Motor Works, she heard the mechanic tell Singh that the Vehicle had to be pulled off the road for safety, and he would need to put it on the lift to determine the extent of the problems.

32.     The Vehicle was returned to Whidbee approximately three weeks later. Whidbee was not provided with a repair invoice at the time of repairs, but she was able to obtain a repair order detail several weeks later which indicated that the Vehicle's upper and lower control arm bushings were worn, causing the Vehicle to wander.  The repair order indicated that British Motor Works replaced the upper and lower control arms and sent the front axle out to have boots replaced.

33.     On or about September 2, 2017, Whidbee was travelling to New York, and when she attempted to parallel park the Vehicle, Whidbee heard a loud bang after applying the brakes, and the Vehicle's sunroof began opening and closing, and a critical brake fault and critical parking brake light came on.  It was raining outside and the sunroof was stuck in the open position.

6

34.     Whidbee borrowed a tarp from the hotel where she was staying and she draped it over the Vehicle's sunroof in an attempt to stop the rain water from getting in through the sunroof.  Whidbee also disconnected the Vehicle's battery for several hours, and after she reconnected the battery, she was able to close the sunroof.

35.     Whidbee contacted the nearest Land Rover dealership but it was closed on September 3 and 4 so she was unable to bring the Vehicle in for service.

36.     Whidbee also contacted the Land Rover Customer Care line but they were unable to offer her any assistance.

37.     Whidbee was able to drive the Vehicle at slow speeds to the Port Jefferson Ferry and back to her home in Waterbury, Connecticut.

38.     Whidbee called British Motor Works on September 5, 2017 and spoke with Singh and told her what happened and asked her to have the Vehicle picked up from her house.

39.     Whidbee met with Jeff Townson at British Motor Works on September 7, 2017, and she told him about all of the problems she had experienced with the Vehicle and she requested that British Motor Works take the Vehicle back and give her another Vehicle.  Whidbee also asked Townson for copies of all repair orders on the Vehicle.

40.     On or about September 7 2017, Whidbee also contacted Land Rover Corporate to file a Complaint.  Whidbee later spoke with Kedar at Land Rover Corporate who told her that the dealership declined to buy back the Vehicle.

41.     On or about September 28, 2017, British Motor Works notified Whidbee that the Vehicle was repaired.  British Motor Works repair order indicated it had

replaced the park brake switch, replaced the cowl and dried out the wiring harness of the sunroof, and made repairs to the timing chain tensioners.

42.     On or about October 9, 2017, while driving the Vehicle on a highway, Whidbee heard a loud bang from the right front end of the Vehicle and the Vehicle began to vibrate, and Whidbee had difficulty steering the Vehicle.

43.     Whidbee called British Motor Works and they instructed her to call road assistance to have the Vehicle towed.

44.     Upon arrival at British Motor Works, Whidbee spoke with Ted Pawlina, General Sales Manager, and Sigh and she told them she did not feel safe driving the Vehicle and that she feared for the safety of her family when driving the Vehicle, and she asked British Motor Works to take the Vehicle back.  British Motor Works refused to take the Vehicle back.

45.     The Vehicle was returned to Whidbee on or about October 19, 2017. Whidbee later obtained a copy of the repair invoice from British Motor Works which indicated that it had replaced the emergency brake actuator and both rear emergency brake shoes and rotors.

46.     On or about October 19, 2017, Whidbee brought the Vehicle to an independent repair facility for inspection.  The repair facility found the following: front stiffener shield bolt loose to subframe; right lower control arm rear bushing is much tighter on the left side, subframe is bent into left side bushing; alignment eccentric bolts in both front lower control arm rear bushings are not tight; tires are getting close to wear bars; dirty power steering fluid; smelled coolant in the Vehicle; left front ball joint

torn; right rear brake pad not contacting rotor fully and appears to be wrong brake pads.  Whidbee paid the facility $219.12 for the inspection and minor repairs.

47.    Whidbee was concerned about the condition of the Vehicle and on October 31, 2017, she brought the Vehicle to an independent autobody expert for inspection.  The expert opined that the Vehicle had been in an event that caused damage to the structure of the Vehicle, and also that the Vehicle had been in a flood, causing extreme corrosion to the Vehicle's frame and engine components.  The expert further opined that the Vehicle was not in merchantable condition at the time of sale to Whidbee and that it was unsafe due to the structural damage to the engine cradle and frame.  The expert opined that any automotive professional could clearly see that the Vehicle had been damaged, was poorly repaired, and was unsafe to drive.  Whidbee paid $650 for the inspection.

48.    Due to the aforementioned defects, the Vehicle was not in merchantable condition at the time of sale.

49.    Additionally, the Vehicle did not meet the criteria for certification under the Land Rover Certified Pre-Owned program.

50.    Additionally, notwithstanding the representation on the Buyer's Guide and the advertisement and the representations by British Motor Works that the Vehicle was a CPO vehicle, British Motor Works did not submit the necessary papers to Land Rover to have the Vehicle included in the Certified pre-owned program and did not provide Whidbee with the Land Rover warranty or the other information that is included in Land Rover Certified Pre-Owned transactions.

51.     At the time that British Motor Works misrepresented the CPO-status of the Vehicle to Whidbee and sold the Vehicle to Whidbee as a CPO vehicle, it knew that its misrepresentations were false, because the condition of the Vehicle would be apparent to anyone in the automotive field.

52.     British Motor Works knowledge of the ineligibility of the Vehicle for CPO-status can further be inferred by the fact that it did not register the Vehicle with Land Rover as CPO.

53.     On or about November 3, 2017 Plaintiff returned the Vehicle to British Motor Works and served notice to British Motor Works and Chase that she had elected to revoke acceptance of the Vehicle or, alternatively, to seek a rescission of the Contract.

54.     Plaintiff's letter demanded a return of her $6,000 down payment plus the installment payments paid to Chase in the amount of $2,044.80, but they have failed and refused to return them.

55.     Chase is subject to the claims and defenses of Plaintiff pursuant to the terms of the Contract and Conn. Gen. Stat. § 52-572g.

## V.  CAUSES OF ACTION

### A.  BREACH OF IMPLIED WARRANTY OF MERCHANTABILITY CLAIM

56.     The vehicle is a consumer product as that term is defined in § 2301(1) of the Magnuson-Moss Federal Warranty Act (15 U.S.C. §§ 2301-2312).

57.     British Motor Works breached the implied warranty of merchantability, Conn. Gen. Stat. § 42a-2-314, in that the Vehicle would not pass in trade without objection and is not fit for its intended purpose.

58.     British Motor Works knew, or reasonably should have known, based on its expertise in the sale and certification of used Land Rover vehicles, that the Vehicle did not meet the standards for "Certified Pre-Owned" status due to its structural deficiencies.

59.     British Motor Works was given a reasonable opportunity to cure the breach of the implied warranty of merchantability.

60.     British Motor Works' breaches of the implied warranty of merchantability were tortious in nature, in bad faith, were wanton and malicious, outrageous, and were undertaken with bad motive and with a reckless indifference to Whidbee's interests and the injury that she sustained.

61.     Specifically, British Motor Works knew that the Vehicle was not actually a CPO vehicle and that it did not qualify for participation in the CPO program but nevertheless misled her into believing that the Vehicle met those standards and that it was certified.

62.     British Motor Works' breach of the implied warranty of merchantability has caused Whidbee to incur damages, including common law punitive damages.

63.     As a result of the above-described actions, British Motor Works is liable to Whidbee for her damages, including common law punitive damages, and for attorney's fees pursuant to Magnuson-Moss.

## B.  BREACH OF EXPRESS WARRANTY CLAIM

64.     British Motor Works made affirmations of fact or promise relating to the Vehicle that became part of the basis of the bargain and that created express warranties pursuant to Conn. Gen. Stat. § 42a-2-313(a).

65.     Specifically, British Motor Works represented that the Vehicle was a CPO vehicle and that it had previously undergone the necessary inspections and met the requisite criteria to be designated as a "Land Rover Certified Pre-Owned" vehicle.

66.     Additionally, British Motor Works' representations that the Vehicle was a CPO vehicle constituted a description of the Vehicle, i.e., that the Vehicle satisfied the rigorous requirements for certification under Land Rover's CPO program, and this description became part of the basis of the bargain.

67.     Additionally, British Motor Works certified that the Vehicle's frame had been inspected and that it was safe and roadworthy in the CT DMV Form K-208 disclosure.

68.     The Vehicle was not, in fact, a "Land Rover Certified Pre-Owned" vehicle.

69.     The Vehicle did not meet the criteria for certification under Land Rover's CPO program.

70.     British Motor Works breaches of express warranties were tortious in nature, in bad faith, were wanton and malicious, outrageous, and were undertaken with bad motive and with a reckless indifference to Plaintiff's interests and the injury that she sustained.

71.     As a result of the above-described actions, British Motor Works is liable to Whidbee for her damages, consequential damages, and common law punitive damages for the tortious breach of the express warranty.

## C. CONNECTICUT UNFAIR TRADE PRACTICES ACT

72.     Through its above-described actions, British Motor Works also violated CUTPA.

73.     Specifically, misrepresenting the Vehicle's condition, history, and its inclusion as a CPO vehicle was an unfair trade practice as established by Conn. Agencies Regs. § 42-110b-28(b)(17) and by Conn. Gen. Stat. § 42-225(a).

74.     British Motor Works further violated CUTPA by failing to provide Plaintiff with a copy of the Purchase Order and failure to provide Plaintiff with copies of repair orders for service to the Vehicle.

75.     As a result of British Motor Works' conduct, Plaintiff suffered an ascertainable loss, including, but not limited to, the purchase of a Vehicle that she did not desire and the value of which was substantially impaired to her, and loss of the benefit of her bargain.

76.     For British Motor Works violations of CUTPA, Plaintiff is entitled tor damages, attorney's fees and costs, and, in the discretion of the court, punitive damages.

WHEREFORE, Plaintiff claims common law damages for the fraud claims, reasonable attorney's fees, and costs pursuant to 15 U.S.C. § 2310(d); actual damages, statutory punitive damages pursuant to C.G.S. § 42-110g(a); attorney's fees pursuant to C.G.S. § 42-110g(d); consequential damages, an order stating that Plaintiff validly revoked acceptance of the Vehicle, and such other further relief to which Plaintiff is, at law, or in equity and by statute, entitled to against defendants.

PLAINTIFF, LISA WHIDBEE

By: /s/ Daniel S. Blinn_____
    Daniel S. Blinn, ct02188
    dblinn@consumerlawgroup.com
    Consumer Law Group, LLC
    35 Cold Spring Rd. Suite 512
    Rocky Hill, CT  06067
    Tel.  (860) 571-0408
    Fax. (860) 571-7457